We'll now hear arguments in City of New York v. Chevron et al. The key dispute in this case, and the point on which almost all of the arguments hinge, is whether the City's lawsuit will have the effect of acting as a regulation of point source emissions outside of New York's borders. Because it will not, the District Court's reasoning and the bulk of the defendant's arguments evaporate. When looking at whether a lawsuit will act as a regulation, it's important to look at the nature of the lawsuit itself, what is actually being inquired into, what is being sought. And it's important to clarify what is a regulation. So a regulation is not some effect that might come down the line. A regulation is a prospective, generally applicable standard that requires a certain standard of conduct. Here, the effect of a judgment for the City is not to impose any particular standard of conduct on the defendants or on anyone else. Rather, the effect is to require the defendants to internalize the costs of their products that they have thus far been able to pass off on to others. That internalization of costs then leaves defendants with a variety of options. Perhaps they can raise prices of oil if that's what's required. Perhaps they could accept lesser profits. Perhaps they could build mitigating effects like carbon sinks or other things to try to mitigate the harms that their products are causing. But none of those are regulated, and none of them relate to emissions, certainly not to out-of-state emissions. The way you get to emissions is then you say, well, depending on which actions the defendants take, then parties further down the extreme of commerce will make their own decisions, perhaps to purchase less oil, perhaps to live closer to work, to any number of other things, and that that might have an effect on emissions. But there is no basis to find that a tort judgment seeking compensation against one party acts as a regulation of third parties down the stream of commerce. Instead, what you have is what this Court has described as upstream pricing impacts. And I direct the Court to the decisions in Vizio and in Freedom Holdings. Both of those were in the context of the Commerce Clause, but they speak to that issue, that in that case even regulations that had an effect on out-of-state pricing were not of the sort that triggered a Commerce Clause violation because they were described as merely upstream pricing impacts. That may change the price down the line. That may change conduct, but that's not a regulation. And it's only when we get into the realm of regulation that it becomes a problem. So but then wouldn't your theory of liability apply regardless of who the actor is up or downstream or what the amount of damage is? What's the limiting principle to what you've just described? Well, the limiting principle is what the effect of the litigation would be. And so if, for instance, the city, which it's not, were seeking to impose punitive damages for failure to abide by a specific emissions level on these defendants, in that case, you know, that then we're in the realm of BMW, perhaps in the realm of Kearns, that is all defendants, the defendants' options are to reduce their emissions. Here we're not challenging defendants' emissions at all. We're not seeking to impose any standard on their conduct. All we're asking for is compensation for the harms that are resulting and that they knew their products would cause for cities like New York. And so the limiting principle is what is the actual effect going to be? Here it is not to affect any sort of regulation on emissions. But then you could separately apply a nuisance theory to sue the emitters. I don't know if that's up or down the stream, but, you know, people who use vehicles. Well, so when you're in the realm, so there's two points that I want to break out on that question. So when you're in the realm of actually targeting emissions, you know, either for compensation or injunctive relief, then at least we're talking about emissions. We're not talking about downstream effects that may lead to emissions. We're actually in that domain. And as for you bringing in auto, you know, particular drivers, now we're talking separate causal issues, separate matters of fact that relate to the amount of harm that these defendants have caused compared to others. And once we — once it's clear that this is not going to act as a regulation of emissions, of point source emissions outside of the State of New York, then the bulk of the district court's reasoning and the defendants' arguments in support of that no longer hold water. Starting with federal common law. The federal common law only applies where there is a significant and actual conflict with a uniquely federal interest. And that's just not the case here. The interests that have been asserted by defendants and by the district court are in regulating interstate emissions. Where this suit doesn't do that, there is no conflict with any federal interest in doing so. Now, the argument that, well, this case involves emissions at some level, that it's about pollution, that it's about global warming. But the emissions are what cause the harms, right? The emissions are a step in the chain that cause that harm, yes. That is that a defendant's product, when used as intended, puts carbon into the atmosphere, which relates to the — which causes warming, which causes our damages. I assume that's probably true of the tunnels, bridges, and highways that the city maintains throughout the five boroughs, too. I guess when those are used as intended, it probably also contributes to global warming. But in any event, it's all about — the causation is emissions. It's not caused, at least directly, by the sale, right? No. No. So it's just — so this is about emissions, isn't it? Well, so I want to be clear that there's a distinction between about emissions and regulating emissions, and that's a key divide. In the same way that the production of lead paint or the production of asbestos or the production of cigarettes doesn't itself cause the harm. It has to be used by third parties. Similarly, the production of gasoline does not itself cause that harm. It has to be used by third parties. And when used as intended, causes the harms that New York City is suffering. Those products, products liability cases, like in — like for asbestos, like for the production of MTBE in this Court's MTBE decision, do not require the application of Federal common law. State common law is perfectly capable of dealing with those cases. Just so here. The reason that we have — that Federal common law exists is to, for instance, prevent interstate conflict, which was the concern that the Supreme Court focused on in the Illinois versus Milwaukee, the Milwaukee one decision, where you had two states both with an interest in regulating the same source. We don't have that here where we're talking about — where we're not seeking to impose regulations. Likewise, there's not the possibility of a single point source emitter being unclear as to what standards it has to follow. Because there aren't different emission standards. The fact that — and to use Justice Gorsuch's phrase, the fact that there is some brooding Federal interest isn't enough to warrant displacing State law. And there has to be something specific. And here there is not, because there is no regulation. The Agent Orange case — Can I ask you about standing? Does the City have standing here? And if so, how? It seems at a minimum there's a traceability problem. Well, so we do have standing. In terms of the traceability of the harm, we — as set forth in the complaint, when defendant's products are used as intended, they release carbon into the atmosphere. That causes the earth to warm. Just as a matter of physics, that those harms then are — the warming, rather, causes things like rises in sea levels, like increased heat, like severe weather events that are causing harm to New York City. And we believe that — and we allege in the complaint that we are able to establish those points. And that's the traceability analysis, both for standing and for the merits that we are going to be able to show. As a matter of pleading, we've established that defendants are liable for a measurable impact on the climate and that that measurable impact is having an effect on New York City. And that's what we have to show. To finish up on the point of — I'm sorry. I see I'm out of time. May I briefly finish on the point of Federal common law? The case that I particularly want to draw Your Honor's attention to is the — is this Court's decision in the Agent Orange case. In that case, there was — I believe it ended up being a class of about two and a half million plaintiffs who were suing the producers of war material that the United States considered to cause severe injuries, and the plaintiffs were suing for a permanent injunction on the production of that war material, making it — taking it outside of the realm of the government to use it further, and were seeking damages beyond the liquid assets of the defendants. Even so, even with all of those factors in place, Federal common law did not apply. That was this Court's holding in Agent Orange. No greater Federal interests are articulated here, and no greater conflict is We ask this Court to reverse. Thank you. We'll now hear from Mr. Boutrous. Yes, Your Honor. Good morning. Theodore Boutrous representing Chevron, and I'm going to be presenting arguments for all of the U.S. defendants. The City of New York is asking this Court to endorse an unprecedented, sweeping, interstate, international, worldwide tort that no court has ever recognized. And as Judge Keenan found, that global warming is an immense and difficult problem, but the courts are not the place to solve the problem. And as Judge Keenan noted, litigating these issues in Federal court raised severe separation of powers and foreign affairs issues. The Court should affirm, we respectfully submit, for at least three reasons. First, as Judge Keenan found, Federal common law governs here because of the interstate and international nature of the claim. The City wants to regulate, and I'll come back to this point, the oil production activities of these companies all around the world and regulate the emissions that result from the use of the products. And the Council and the City have been relying on the wrong set of cases for determining whether Federal common law applies. The Texas industry case from the Supreme Court says it perfectly, that where there's an interstate and international component where the claim is based on that sort of activity, state law cannot apply because of the likelihood of conflict among the states. If all the states try to regulate the same conduct, that's not feasible. And the Court literally says in Texas industries and in Milwaukee, one, that our Federal system does not permit the controversy to be addressed by state law, and therefore the body of law we look to, as the District Court did, is Federal common law. And as the Court found, Federal common law does not provide a remedy here because under AEP, the Clean Air Act displaces the Federal common law because Congress has spoken directly to the issue. Plus, the Federal courts would be injecting themselves into foreign policy issues and foreign affairs issues regarding climate change negotiations between the United States and other countries and policies that our country has regarding how to interact with other nations in this global problem. Doesn't that make this a political question, that it's not justiciable, rather than something that we should turn to Federal common law for? Your Honor, there are elements of separation of powers, and I think that does get us towards the political question doctrine. But as pleaded here, I think there are a number of ways to look at this, but I think the easiest way is to, first, choice of law. What law applies here? It can't be state law. There is regulation. Counsel jumps over the point that their claim seeks to hold companies liable for the lawful, socially useful production of oil anywhere in the world. The only way to escape liability here is to stop producing oil, according to the city. Page 19 of their brief, they say they're giving up all their accusations, and they say they're assuming that the conduct of the companies was lawful, reasonable, and socially useful, and they're saying that the only thing they're not doing right is compensating the city, which, as Judge Solomon, I think you were alluding to, is engaged in the consumption and the burning of fossil fuels and contributing to the issues they're talking about. But I do think, Judge Park, that it's really more of a separation of powers question. And under the federal common law principles here, under the city's view, that this isn't regulation, that makes no sense. The Kern case from the Supreme Court says tort claims for compensatory damages have a, it was a preemption case, so it's very close to this case, has a regulatory effect because the only way the defendant can escape liability is to get out of state. The Ouellette case, which was a case regarding preemption of the Clean Water Act, the Supreme Court said very clearly that a tort claim there for compensatory damage is an injunctive relief, like this case, that the damage action there would have a regulatory effect and would allow the state to do what, indirectly, what it can't do directly, which is to regulate out-of-state activities. So we, Judge Keenan was exactly right, it's the interstate, international nature of the claim that requires federal common law to be the body we look to. And then step two is, can the federal courts, should the federal courts act to create a cause of action? The answer is no. The second route to, second path to the same place that Judge Keenan arrived at is the one that the United States charts in its brief. The United States says, assuming there could be a state law claim, it's preempted under the analysis in the Ouellette case, which I just mentioned, which held that the Clean Water Act preempted a state law claim that sought to apply one state's law to out-of-state activities, and there it was, water pollution. And here, that's exactly what the city's trying to do. The city's trying to apply New York law to oil and gas production around the world and around the nation under New York law, even though those other jurisdictions as a matter of federalism have their own policies regarding those activities. And even though the Clean Air Act, which mirrors the Clean Water Act, creates national standards for emissions and then carves out an area for each state to apply, New York would just take it all over. New York standards would govern. And counsel said they're not seeking the application of a standard. They are. It's absolute liability for oil companies. If you produce oil and gas and sell it, then you must compensate New York. So it's about the most absolute standard of conduct. And the only way to escape it, and this is the essence of regulation, is to cease the activity. The third point I wanted to make. Roberts. Preemption, a more direct approach than sort of two-step reasoning that you set forth in your brief, the Federal common law governs and then the displacement. I guess in terms of the structure of the reasoning, I don't understand why you wouldn't just go straight to preemption. We believe, Your Honor, that our approach is the right one here where we're talking about just figuring out what law applies. But it's definitely another approach that we agree with, that we can just assume state law applies and then go down the preemption route. The analysis is very similar. As the United States points out, the Clean Air Act preempts because of all those standards and the cooperative federalism and relationship. And then the foreign commerce clause and the foreign affairs doctrines preclude the process, which is go after the production companies. And as Judge Keenan found, they're clearly trying to target emissions. Without emissions, there's no climate change. So the essence, they mention emissions 47 times in their complaint. So that's what they're targeting. That's the linchpin of their claim. But I do think, Your Honor, that the preemption route is another route. It's a very similar rationale. And the other path is to look at what the New York courts would do. And I think it's really interesting that the New York Court of Appeals and the appellate division, the Hamilton case from the New York Court of Appeals and the Sturm and Ruger case, really have an analysis very similar to Judge Keenan's analysis, but under state law. Those were gun cases, public nuisance, negligent marketing. Those cases said, New York's substantial law, we're not going to invent novel torts to try to solve difficult policy questions that are of national scope. And the courts of New York don't have the, just the means to do that and to use a nuisance claim. The Sturm and Ruger case said to use a nuisance claim, like the plaintiffs are here, under New York law, would engulf all of tort law and embroil the courts in areas where the legislative and executive branches must act. And so I think in predicting, obviously, this Court does not sit to create new novel New York torts to predict what the New York courts would do. We know they would reject this claim as a matter of law. So that's another path to deciding the case. And that brings me to the MTBE case and the other, the closest cases that counsel has, the Agent Orange case. They're nothing like this. They did not involve a state or city seeking to apply one state's law to interstate activity, let alone worldwide activity. They were traditional tort cases where an injured person sued under state law for a product that was, that had an impact on them in a particular state. Totally traditional. And in Agent Orange, the Court found there that there was no clear federal interest and that it was a policy question for Congress. But it just wasn't anything like this. And here again, the unique federal interest is that the federal system, federal law, is the only law that can deal with the conflicts among the states and reconcile the federalism interests of all the states in regulating behavior within their borders. The City of New York simply cannot project its law. It would be inappropriate for it to do so. So for all those reasons, we run out of time. Can I just ask you briefly also about standing? Could you just address the issue quickly? We think that they've pleaded standing. And so at least for the pleading stage, as counsel said, they plead an injury. I do think, and again, the New York courts have talked about traceability from a state law standpoint. This is a, you know, they admit that when the greenhouse gas emissions, after the product is purchased somewhere around the world, they immediately disperse and you can't trace where they came from. So they've got major problems, but at least at the pleading stage, Your Honor, we have not made a standing argument. Thank you. And we respectfully request the Court affirm global warming is an important issue, but tort suits are not the way to resolve it. Thank you. Thank you, Mr. Boutrous. We'll hear from Mr. Moore for two minutes. Thank you, Your Honor. I just want to make a few brief points in rebuttal. First, defense counsel never addressed the fact that any effect on regulations has to come from ultimately third parties to the defendants here. So he's saying that this naturally acts as a regulation, but it's not of defendants, and there's no case law and no body of law to suggest that regulation of entirely third parties can be affected by a tort judgment against defendants in a case. The current What do you mean entirely third parties? So those would be the consumers of the product who are ultimately the ones who are causing the emissions. We're not alleging any harms from defendants' own emissions. We're alleging the harms from the products that they sell that are then emitted burned and emitted by other parties. Right. But Mr. Boutrous's point is that the only way to avoid liability is to stop producing oil, right? Well, that brings me to the second point, which is that that's a misstatement of the city's theory here. So, yes, the production of oil is part of that, but it goes beyond their conduct in doing that. We also plead throughout the complaint that as far back as the 1980s, the defendants knew, based on their own documented records, that there were catastrophic – that's their words, not mine – that there were catastrophic consequences likely to come from their production of their product. They knew the harms that were going to cause. Rather than take any steps to mitigate that, they doubled down on their production and they sought to prevent others from mitigating by trying to obfuscate the science that, again, that was the result of their own studies. So this is an emissions case? Again, Your Honor, emissions are ultimately how defendants' product causes the harm to the city. That's a step in the causal chain. It seems like you're trying to have it both ways. I mean, at some points when it comes to the harm, you're arguing that it's about the emissions, but then it's not regulation for that. On the other hand, presumably to avoid the body of case law that would say that you can't do that. So the key point here is, I think, not emissions and whether emissions is part of the case or not. It's whether there's regulation. And so defendants ultimately are urging sort of a key word jurisprudence, that because in describing this case the word emissions is going to be used, then we're into the realm of federal common law, we're into the realm of preemption. But that's not the standard the court has ever applied. Rather, there has to be actual conflict. And I agree that the court should look to the Texas industry's decision. It talks about there has to be actual conflict. And here where there's not regulation, where there's not the possibility of two states fighting out over whose regulations govern or whether a particular point source emitter isn't going to be confused by which standard they have to apply, there's no basis to find that there's regulation. There's no basis to apply preemption or federal common law doctrines. Just to close on the point of State law, we agree with defendants that it's not the role of this Court to determine what State law would find here, that ultimately what they're arguing is not that we don't meet the elements of nuisance as have been set out for nearly a century in New York law. They're arguing that New York courts have a policy interest in not promoting these cases. We disagree with that. I mean, if you look at the Hamilton decision, they say tort law is ever-changing. If you look at the Sturm-Ruger decision, they say we are not saying, just as the Court of Appeals has not said, that a common law public nuisance claim is always an inappropriate legal tool to address consequential harm from all forms of commercial activity. But, I mean, it seems to me that if we really wanted to hear what New York courts thought about that, we'd certify the question. You're anticipating where I'm going with this, Your Honor. Yes. To the extent that that becomes a decisive fact point for this Court, then certification would be appropriate. We don't think it is. We think we've alleged a claim. We certainly think that the district court's reasoning in not considering the claim and not allowing us to try to prove that up was an error. To the extent that the Court seeks to determine the State law, certification would be appropriate. Okay. Thank you, Mr. Moore. Thank you very much.  Well argued.  We'll reserve decision.